## IN THE COMMON PLEAS COURT OF
## PIKE COUNTY, OHIO

JAMES MATTHEWS, JENNIFER
BROWNFIELD CLARK, JOANNE ROSS,
AND the ESTATE of A.R., deceased minor child
by and through his parent and natural guardian
Joanne Ross

ON BEHALF OF THEMSELVES
AND ALL OTHERS SIMILARLY SITUATED,

      Plaintiffs,

v.

CENTRUS ENERGY CORP.
A Delaware Corporation, individually and as
successor-in-interest to USEC Incorporated,

UNITED STATES ENRICHMENT
CORPORATION
A Delaware Corporation,

URANIUM DISPOSITION SERVICES, LLC
A Tennessee Limited Liability Company,

BWXT CONVERSION SERVICES, LLC
A Delaware Limited Liability Company,

MID-AMERICA CONVERSION SERVICES
A Delaware Limited Liability Company

BECHTEL JACOBS COMPANY, LLC
A Delaware Limited Liability Company,

LATA/PARALLAX PORTSMOUTH, LLC
A New Mexico Limited Liability Company,

FLUOR-BWXT PORTSMOUTH, LLC
An Ohio Limited Liability Company,

      Defendants.

CASE NO. *2019CIV000354*

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

FILED
COMMON PLEAS COURT
NOV 27 2019
JUSTIN P. BREWSTER
PIKE COUNTY CLERK

Exhibit A

## CLASS ACTION COMPLAINT

### INTRODUCTION

**NOW COME** Plaintiffs and Putative Class Representatives, James Matthews, Jennifer Brownfield Clark, Joanne Ross, and the Estate of A.R., deceased minor child by and through his parent and natural guardian Joanne Ross, individually and on behalf of all others similarly situated, hereby filing their Complaint against the Defendants for damages, equitable, statutory, and injunctive relief.  In support thereof, Plaintiffs state as follows:

### NATURE OF THE ACTION

1.     In Pike County, Ohio sits the 3,777 acre Portsmouth Gaseous Diffusion Plant, hereinafter "the A-Plant", which has accommodated uranium enrichment operations by the Defendants.

2.     What the surrounding populace did not know was that the operations at the A-Plant expelled radioactive material and other metals into the air, water, and soil.

3.     This expulsion of radioactive materials has occurred in such concentrations that these materials and metals can be found in the air, water, and soil in the residences, schools, and businesses in and around Pike County, Ohio.

4.     On May 13, 2019, Zahn's Corner Middle School, formerly Zahn's Corner Elementary School, was suddenly closed after enriched uranium was detected within the school, and Neptunium-237 was detected by an air monitor outside of the school. The school, which sits approximately two (2) miles from the A-Plant, once served as the Scioto Valley Local School District's only elementary school, and most recently served as the school district's only middle school, with approximately 300 students attending class daily.

2

This was the first verified notification to the community that these various radioactive materials were being expelled into the surrounding areas.

5.     Plaintiffs seek compensatory damages, and statutory damages for the injuries they have suffered from the radioactive and toxic materials released by Defendants.

6.     Plaintiffs also seek injunctive relief to protect themselves, and Class Members from further injuries.

7.     Plaintiffs and Class Members are individuals who have suffered personal injuries, economic losses, property losses, and non-economic damages as the result of the Defendants actions, and inactions. Plaintiffs and Class Members have all suffered in common as array of injuries and damages from the Defendants' expulsion of radioactive material, as explained further, in more detail herein.

8.     Through their actions, and inactions, Defendants have negligently created conditions in which the surrounding populace has been, and continues to be injured. The Defendants have caused the Plaintiffs, and Class Members to suffer damages.

9.     Plaintiffs bring this civil action for injunctive relief, compensatory damages, statutory damages, and any other relief allowed by law against the Defendants for their toxic and radioactive releases of material into the surrounding area that injured, and continue to injure the Plaintiffs and the class.

10.     Plaintiffs' claims do not fall within the scope of the Price-Anderson Act. Plaintiffs expressly contend that the ongoing and continuous releases that injured the Plaintiffs and Class Members are not "nuclear incidents" as that term is defined in the Price-Anderson Act. Plaintiffs' claims are freestanding state law claims concerning

3

traditional-style state regulation and do not implicate the Price-Anderson Act and its textually manifest concerns related to liability limitation and indemnification.

## PARTIES

### A.    Plaintiffs

11.    Putative Class Representative and Plaintiff, James Matthews, is above the age of majority and lived approximately four (4) miles from the A-Plant. Mr. Matthews attended Zahn's Corner Elementary School, nka Zahn's Corner Middle School, from approximately 1981 to 1986. In December 2011, Mr. Matthews was diagnosed with Carcinoid Cancer, which had been slowly growing within him for an indecipherable number of years. Mr. Matthews seeks compensatory damages, and statutory damages.

12.    Putative Class Representative and Plaintiff, Jennifer Brownfield Clark, is above the age of majority and lived approximately one (1) mile from the A-Plant. At nine (9) years old, Mrs. Brownfield Clark was diagnosed with Papillary Thyroid Cancer, which has been present within her body for an indecipherable number of years. Mrs. Brownfield Clark seeks compensatory damages and statutory damages.

13.    Putative Class Representative and Plaintiff, Joanne Ross, is above the age of majority and lives approximately two (2) miles from the A-Plant. Mrs. Ross suffers from Squamous Cell Skin Cancer, Heart Disease, and Depression. Mrs. Ross' son attended Zahn's Corner Middle School, and succumbed to an illness in relation to his Metastatic Wilm's Tumor on September 28, 1994, at the age of thirteen (13) years old. Described in more detail herein. Mrs. Ross seeks compensatory damages and statutory damages.

14.    Putative Class Representative and Plaintiff, A.R. (now deceased), was a

4

minor child at the time of his diagnoses and death, therefore his claim is brought through the executor of his estate, parent and natural guardian, Joanne Ross. A.R. lived his entire life approximately two (2) miles from the A-Plant. A.R. attended Zahn's Corner Middle School at the time of his death. In 1993, at the age of twelve (12) years old, A.R. was diagnosed with a Wilm's Tumor. The tumor metastasized and spread throughout his body, most notably his lungs, where 15 tumors were removed prior to his death. On September 28, 1994, A.R. succumbed to his cancer after battling pneumonia. The Estate of A.R. is seeking compensatory damages and statutory damages.

**B.** **Defendants**

**Gaseous Diffusion Plant and Centrifuge Plant Defendants**

15.    Defendant Centrus Energy Corp., hereinafter "Centrus", formerly USEC Incorporated, hereinafter "USEC Inc." is a Delaware corporation with its principal place of business in Maryland. This action is brought against Centrus individually, and as a successor-in-interest to USEC Inc.

16.    Defendant United States Enrichment Corporation, hereinafter "USEC", is a Delaware corporation with its principal place of business in Maryland and is a wholly owned subsidiary of Centrus.

**Depleted Uranium Hexafluoride Plant Defendants**

17.    Defendant Uranium Disposition Services, LLC, hereinafter "UDS", is a Tennessee limited liability company with its principal place of business in Florida.

18.    Defendant BWXT Conversion Services, LLC, hereinafter "BWXT", is a Delaware limited liability company with its principal place of business in Kentucky.

19.    Mid-America Conversion Services, LLC, hereinafter "MCS", is a Delaware

limited liability company with its principal place of business in Kentucky.

**Environmental Remediation and Waste Management Defendants**

20.     Bechtel Jacobs Company, LLC, hereinafter "Bechtel Jacobs", is a Delaware limited liability company with its principal place of business in Tennessee.

21.     Lata/Parallax Portsmouth, LLC, hereinafter "Lata", is a New Mexico limited liability company with its principal place of business in New Mexico.

22.     Fluor-BWXT Portsmouth, LLC, hereinafter "Fluor", is an Ohio limited liability company with its principal place of business in Ohio.

## JURISDICTION AND VENUE

23.     Jurisdiction of this Court arises under the R.C. 2305.01.

24.     Diversity does not exist as the Plaintiffs are residents of the state of Ohio, and Fluor is an Ohio limited liability company with its principal place of business in Ohio.

25.     Furthermore, Defendants have engaged in conduct and activities over a long time individually, jointly, and severally, in Ohio that have caused all of the damages of Plaintiffs and Class Members, all of which form the causes of action in this Complaint as against Defendants. Defendants have repeatedly committed multiple torts and breaches within the state of Ohio.

26.     Additionally, Defendants have long, repeated, and substantial contacts and business relationships within Ohio, and its populace, specifically in the Pike County area, some or all of which form the basis of the causes of action in this Complaint against Defendants.

27.     This Court has personal jurisdiction over each Defendant, as each have

committed torts within the state of Ohio, as alleged herein. Moreover, Defendants have substantial contacts and business dealings directly within Ohio by virtue of their relationship with the A-Plant. All causes of action herein relate to Defendants' actions, and inactions, committed against Plaintiffs and Class Members, and the injuries and damages related to said actions, and inactions.

28.　Venus is proper in Pike County pursuant to Civ.R. 3(C)(3) and (6). Defendants conducted activity in Pike County that gives rise to these claims for relief, and all or part of Plaintiffs' claims for relief arose in Pike County.

## FACTUAL ALLEGATIONS

### Operations at the A-Plant

#### Gaseous Diffusion Plant

29.　The A-Plant is located in Pike County, Ohio and operated as a gaseous diffusion plant. From July 1993, until 2001, USEC completed uranium enrichment operations at the A-Plant. The primary mode of enrichment at the A-Plant was the gaseous diffusion of uranium hexafluoride to separate the lighter fissile isotope, U-235, from the heavier non-fissile isotope, U-238.

30.　From 2001 to 2011, USEC was responsible for maintaining the A-Plant in a safe configuration. Initially, the equipment was to be maintained in a "Cold Standby", where it was capable of restarting the gaseous diffusion process if needed. Eventually, however, the equipment was transitioned to a "Cold Shutdown", where the systems were permanently disengaged, and the equipment prepared for decommissioning and decontamination.

## Depleted Uranium Hexafluoride Conversion Plant

31.    In 2002, UDS was contracted to design, build, and operate a Depleted Hexafluoride Conversion Plant.

32.    Depleted uranium hexafluoride is a coproduct of the uranium enrichment process that occurred at the A-Plant. The Depleted Hexafluoride Conversion Plant was designed and constructed to convert inventory of depleted hexafluoride produced by the A-Plant, and the Paducah Gaseous Diffusion facility, hereinafter "Paducha", (a similar gaseous diffusion plant located in McCracken County, Kentucky), to a more stable uranium oxide form for reuse, storage, and/or transportation and disposition. A coproduct of this conversion process is hydrofluoric acid, which is reused industrially. The A-Plant's depleted uranium hexafluoride is expected to be processed in approximately 18 years.

33.    In 2010, BWXT was contracted to operate the depleted uranium hexafluoride conversion plant. BWXT was also responsible for continuing cylinder surveillance and maintenance services for the inventory at the A-Plant. This inventory included depleted uranium hexafluoride, low-enrichment uranium hexafluoride, normal hexafluoride, and other cylinders of materials. The contract was initially scheduled to expire in September 2016, but was extended to accommodate procurement of a new depleted hexafluoride contract.

34.    In 2016, MCS was contracted to operate the depleted uranium hexafluoride conversion plant. MCS is responsible for providing surveillance and maintenance for the conversion plant, the associated equipment, and the cylinders of various materials. MCS is also responsible for converting the depleted uranium hexafluoride from the A-Plant, and Paducha to uranium oxide, storing, transporting, disposal of the conversion end

products, and the selling of aqueous hydrofluoric.

**Centrifuge Operations**

35.    In 2002, USEC Inc. signed a lease for the use of centrifuge-related equipment and facilities at the A-Plant.

36.    In 2004, USEC Inc. began operating what is known as the American Centrifuge Lead Cascade Facility, hereinafter "Lead Cascade". The Lead Cascade was a test loop which demonstrated the effectiveness of centrifuge design and equipment by processing uranium in a closed loop.

37.    In 2016, USEC, Inc.'s successor, Centrus, ceased uranium enrichment operations at the Lead Cascade. This was followed by the removal of uranium gas from the centrifuges and process piping, the dismantling of equipment, and other actions needed to ultimately decommission the facility. The Lead Cascade is currently in this decommissioning phase.

38.    The Lead Cascade was a test loop for Centrus', American Centrifuge Plant, hereinafter "ACP". In 2007, Centrus began construction of ACP, but stopped in 2009. In January 2019, Centrus announced that they would be reopening the facility, and construction is once again underway.

39.    Centrus' centrifuge operations are carried out pursuant to source material licenses which allow for the possession of radioactive material, but do not allow for the disposal of radioactive material.

**Environmental Remediation and Waste Management**

40.    Environmental cleanup and remediation has been taking place at the A-Plant since 1989.

41. Between 1997 and 2005, Bechtel Jacobs was responsible for the environmental remediation at the A-Plant.

42. From 2005 until 2010 LATA was responsible for the environmental remediation at the A-Plant, including: groundwater and soil remediation, removing legacy waste, decontamination and decommissioning facilities, disposition of highly enriched uranium, operating the site's waste storage facility, surveillance and maintenance activities, as well as other like actions.

43. Since 2010, Fluor has been responsible for the environmental remediation at the A-Plant. Their work is expected to continue until 2024.

44. In 2015, it was agreed that more than 2 million cubic yards of waste generated from the decontamination and decommissioning of the A-Plant would need disposed of. In order to dispose of this waste, an on-site waste disposal facility has been planned. Construction of this facility began in 2017.

**Defendant's Wrongful Conduct and Liability**

45. As stated above, in May 2019, Zahn's Corner Middle School was shut down, and remains shut down, over safety concerns when enriched uranium was discovered inside the school. Neptunium-237 was also detected by an air sensor outside of the school.

46. Other locations around the A-Plant have elevated presence of radioactive particles.

47. Environmental evidence indicates that property and persons near the A-Plant have been and continue to be exposed to toxic and radioactive substances, which have had negative impacts on their health and well-being.

48. These toxic and radioactive substances are consistent with those that could be expected to be found near a site that conducts uranium enrichment operations, such as the A-Plant.

49. A study by Northern Arizona University has determined that enriched uranium has been found in surface waters, sediments, and interior dusts, consistent with the operations of the A-Plant, in the surrounding community. Additionally, the University found non fallout [237]NP (Neptunium) and Pu (Plutonium) isotopes in the bed sediments, suspended sediments, and interior dust of the surrounding community. Non fallout [237]NP (Neptunium) was also found in sediments of a creek draining from a landfill construction area. Enriched Uranium has been found in the interior of Zahn's Corner Middle School, as well as attic dust in the surrounding community. These enriched substances found within the community can be accounted for by emissions from the A-Plant.[1]

50. Plaintiff, James Matthews, lived approximately four (4) miles from the A-Plant. Mr. Matthews attended Zahn's Corner Elementary School, nka Zahn's Corner Middle School, from approximately 1981 to 1986.

51. Plaintiff, Jennifer Brownfield Clark, lived approximately one (1) mile from the A-Plant.

52. Plaintiff, Joanne Ross, lives approximately two (2) miles from the A-Plant.

53. Plaintiff, A.R. (now deceased), lived his entire life approximately two (2) miles from the A-Plant. A.R. attended Zahn's Corner Middle School at the time of his death.

54. Defendants could not have prevented all risks from harm to humans from

---

[1] Michael E. Ketterer, *Investigations of Anthropogenic Uranium, Neptunium, and Plutonium in Environmental Samples Near Piketon, Ohio*, April 7, 2019.

their operations, but they could have prevented or mitigated the offsite impact with better precautionary measures, compliance with applicable regulations, and the use of reasonable care. The foreseeable risks of harm posed could have been reduced or avoided by reasonable instructions or warnings when it became clear that toxins had been released into the environment. Those omission render Defendants' operations not reasonably safe. Exposure to this radioactive and toxic mixture in the environment can cause grave bodily injury and has created a need for a mitigation/abatement program to protect the public from further risk of being harmed by Defendants' tortious contamination of the surrounding community. Irrespective of Defendants unconscionable behavior, these claims are subject to absolute/strict liability.

55.    Defendants, through their silence, as well as their aggressive public relation efforts, have reassured the public and Plaintiffs that their operations have not contaminated the surrounding community. In particular, Defendants made misrepresentations that were meant to assure Plaintiffs that the A-Plant presents absolutely no danger to public health.

56.    On information and belief, Plaintiffs allege that expulsions of highly toxic and radioactive materials from the A-Plant into the surrounding area have created an imminent and substantial endangerment to public health.

57.    On Information and belief, Plaintiffs allege that Defendants have attempted to mislead and misrepresent the nature of the materials being expelled into the surrounding community.

58.    On information and belief, Plaintiffs allege that Defendants have attempted to mislead and misrepresent the surrounding community about the dangers of the toxic

and radioactive materials being expelled into the community.

59. As a direct and proximate result of Defendants' conduct, Plaintiffs and the Class have been and are currently being subjected to radioactive waste contamination. They have suffered due to this contamination, and will continue to suffer irreparable harm if an injunction is not granted requiring Defendants to conduct a total and complete cleanup of the contamination and to prevent and eliminate further contamination.

**Radioactive Wastes**

60. Ounce for ounce, radioactive isotopes are considered the most toxic materials known to man.

61. Radiation is a type of energy transmitted over a distance. Some materials spontaneously emit radiation through a process known as radioactive decay. As these materials decay they release radiation energy and transform into other materials which may then also decay by releasing radiation energy and transforming into other materials.

62. Some radiation energies, including the radiation from the decay of radioactive materials used in nuclear and atomic processes, such as uranium, have the ability to penetrate other material. When radiation energy interacts with other material, it causes a process called ionization which can damage chemical structures. When the "other material" that ionizing radiation passes through is human cells, it can cause damage within those cells resulting in mutations in genetic material, which can lead to cancer and other harms.

63. People are exposed to radiation in two ways: external from radioactive material in the environment, and internal exposure by radioactive material that has entered the body. Radioactive material can be taken into the body by consuming

13

foodstuffs and liquids with radioactivity in them, by inhaling radioactive gases or aerosol particles, or by absorption through wounds in the skin. The material taken in will internally expose the organs and tissues for as long as it remains inside the body.

64.    One characteristic of the impact of exposure to ionizing radiation on the human body through both internal and external exposure is that, even if the energy absorbed is low, the biological effects can still be gravely serious. Another characteristic is that there are latent biological effects of radiation.

65.    The injuries resulting from exposure to ionizing radiation can also be separated into two categories: somatic injuries and genetic injuries. Somatic injuries are damages to the individual exposed. These include damages to the skin, reproductive system, blood forming system, digestive system, central nervous system, and immune system, as well as cancers. Illnesses such as cancers may take a number of years to appear. Research shows that uranium has a high chemical affinity for DNA and causes genetic damage to individuals resulting in birth defect outcomes and cancer at levels much greater than previously modelled.

66.    Genetic injury is damage to the reproductive cells of the exposed individual in the form of mutation of their genetic cells. As a result, the probability of detrimental effects to the descendants of the exposed persons may greatly increase. These genetic mutations can be passed down to a person's offspring even generations later, manifesting in injuries such as birth abnormalities and cancer.

67.    One of the most dangerous aspects of radioactive materials is the length of time that radioactive isotopes will persist and accumulate in the environment. As detailed above, radioactive materials decay over time, and each radioactive material gives off

radiation energy as it decays and transforms into a different material. The rate at which a radioactive isotope decays is measured in half-life. The term "half-life" is defined as the time it takes for one-half of the atoms of a radioactive material to disintegrate. For example, after one half life, there will be one half of the original material, after two half-lives, there will be one fourth of the original material, after three half-lives, there will be one eighth of the original material, and so forth.

68.     The toxic and carcinogenic effects of exposure to radioactive materials have been a matter of general scientific knowledge since the early 20th Century.

## CLASS ACTION ALLEGATIONS

69.     Plaintiffs seek to represent the following class of individuals:

*All individuals and minor children who were exposed to the toxic and radioactive material expelled by the Portsmouth Gaseous Diffusion Plant, as explained above.*

70.     Excluded from the Class are children of the Defendants and their officers, directors, and employees, as well as the Court and its personnel.

71.     All members of the class were present in the area surrounding the A-Plant and have suffered physical injury from their exposure to the toxic and radioactive materials.

72.     Plaintiffs and all other similarly situated are entitled to have this case maintained as a class action pursuant to Civ.R. 23(a) for the following reasons:

> 1) The class is so numerous that joinder of all members would be impracticable. The current size of the class is not precisely known, but Plaintiffs believe that it is large enough to warrant class

treatment;

2) There are common questions of law or fact shared amongst the class, namely whether the Defendants' operations at the A-Plant caused the expulsion of toxic materials into the surrounding community, and those toxic materials are both capable of, and in fact did cause the class members illnesses and cancers;

3) The claims and/or defenses of the representative parties are typical of the claims or defenses of the class. Plaintiffs suffer from injuries and increased health risks typical of the class, which have necessitated medical treatment, medical monitoring, and future medical treatment. Plaintiffs' interests are identical to, and aligned with other members of the class. Plaintiff and Class Members have all suffered an array of damages all stemming from the common trunk of facts and issues related to their exposure of toxic and radioactive materials expelled from Defendants' operations; and

4) The representative parties will fairly and adequately protect the interest of the class. Plaintiffs and counsel are unaware of any conflicts of interest between Plaintiffs and absent Class Members or otherwise that cannot be managed through the implementation of available procedures. Plaintiffs are knowledgeable concerning the subject matter of this action and will assist counsel in the prosecution of this litigation.

73. Further, any denial of liability and defenses raised by the Defendants would

16

be applicable to all claims presented by all members of the class or can otherwise be managed through available procedures.

74. Defendants' conduct presents predominant common factual questions. This class is bound together by the common factual questions relating to whether the Defendants' operations exposed the surrounding community to toxic and radioactive materials, then causing their illnesses and cancers; thus certification is proper under Civ.R. 23 (c)(4). Regardless of whether Plaintiffs and the Class Members are presenting individualized damages such as pain & suffering, they will present common liability proof that is the same for each member of the Class. Across claim categories, Plaintiffs' common proof of Defendants' liability will involve the same cast of characters, events, discovery, documents, fact witnesses, and experts.

75. The need for proof of Plaintiffs' and Class Members' damages will not cause individual issues to predominate over common questions. The amounts of economic and non-economic losses can be efficiently demonstrated either at trial or as part of routine claims administration through accepted and court-approved methodologies set forth in the Federal Manual for Complex Litigation with the assistance of court-appointed personnel, including Special Masters. Certain types or elements of damage explained below as appropriate under Civ.R. 23(b)(3) are subject to proof using aggregate damage methodologies or simply rote calculation and summation on a class-wide basis while individual damages may be determined via the mechanisms explained above.

76. A class action is superior to maintenance of these claims on a claim-by-claim basis when all actions arise out of the same circumstances and course of conduct. A class action allows the Court to process all rightful claims in one proceeding. Class

litigation is manageable considering the opportunity to afford reasonable notice of significant phases of the litigation to Class Members and permit distribution of any recovery. The prosecution of separate actions by individual Class Members, or the individual joinder of all Class Members in this action, is impracticable and would create a massive and unnecessary burden on the resources of the courts and could result in inconsistent adjudications, while a single class action can determine, with judicial economy, the rights of each member of the class or subclasses, should that be determined to be appropriate.

77. The conduct of this action as a class action conserves the resources of the parties and the court system, protects the rights of each member of the class, and meets all due process requirements.

78. Certification of the Class with respect to particular common factual and legal issues concerning liability and comparative fault, as well as the necessary and appropriate quantum of punitive damages, or ratio of punitive damages to actual harm, is appropriate under Civ.R. 23(c)(4).

79. The particular common issues of liability, comparative fault, and the quantum of punitive damages or ratio of punitive damages to actual harm, are common to all Class Members no matter what type of harm or injury was suffered by each Class Member.

80. A class action may be maintained under Civ.R. 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, thereby making appropriate the entry of equitable and/or injunctive relief, including a total and complete cleanup of the contamination and to prevent and eliminate further

18

contamination.

81.    The particular common issues of liability, comparative fault, and the quantum of punitive damages or ratio of punitive damages to actual harm, are common to all Class Members no matter what type of harm or injury was suffered by each Class Member.

## CAUSES OF ACTION

### COUNT I – NEGLIGENCE/GROSS NEGLIGENCE

82.    Plaintiffs reassert the allegations of the foregoing paragraphs as if set forth fully herein.

83.    Defendants owed a non-delegable duty to the Plaintiffs and Class Members to conform their behavior to the legal standard of reasonable conduct under the circumstances, in light of the apparent risks.

84.    Defendants' operations, conduct, acts, and omissions violated duties owed to Plaintiffs and Class Members.

85.    There is no social value in Defendants' actions of expelling toxic and radioactive material into the surrounding community. Additionally, there is no social value in Defendants' actions of misrepresenting the harm risked by the expulsions into the community.

86.    There is immense social value in protecting the safety of our communities, including our schools, businesses, and personal residences.

87.    Defendants failed to act as a reasonably prudent nuclear operator under like circumstances would.

88.     Defendants' failure to warn also constitutes negligence on their behalf.

89.     Plaintiffs and Class Members are without fault, and the injuries to Plaintiffs and Class Members would not have happened in the ordinary course of events if the Defendants had not acted negligently.

90.     Radioactive isotopes are some of the most dangerous substances known to man. Defendants breached their duty to exercise the extreme degree of care, prudence, watchfulness, and vigilance commensurate to the dangers involved in their operations at the A-Plant.

91.     Defendants were negligent or reckless in not acquiring and/or utilizing specialized knowledge and skills related to their dangerous operations that could have prevented the expulsion of toxic and radioactive material into the surrounding community.

92.     As a direct and proximate result of Defendants' negligence, the community surrounding the A-Plant has suffered from injuries and damages.

93.     Plaintiffs and the Class have also suffered injuries and damages as they have all been personally diagnosed with cancers.

## COUNT II – NUISANCE

94.     Plaintiffs reassert the allegations of the foregoing paragraphs as if set forth fully herein.

95.     Defendants' conduct as set forth herein constitutes the tort of nuisance which is ongoing and has resulted in injuries and damages to Plaintiffs and the Class.

96.     All Defendants substantially participated in nuisance-causing activities.

97.     Defendants' activities unreasonably interfere with the rights of Plaintiffs and the Class. The citizens and children of Ohio have a common right to be free from conduct

20

that creates an unreasonable jeopardy to the public health and welfare.

98.     Defendants' interference with these rights of Plaintiffs and the Class is unreasonable as it has harmed and continues to harm the community surrounding the A-Plant, it is of a continuing nature and has produced long-lasting effects, and the Defendants had reason to know their conduct has a significant effect upon the Plaintiffs and the Class.

99.     The nuisance undermines public health, quality of life, and safety. It has resulted in inordinately high amount of illnesses and cancers in the area that can be linked to the toxic and radioactive materials expelled by the Defendants.

100.    At all times, the Defendants had the ability to control the nuisance of the expulsion of the toxic and radioactive materials into the surrounding community.

101.    As a direct and proximate result of the nuisance, the community surrounding the A-Plant has suffered from injuries and damages.

102.    Plaintiffs and the Class have also suffered injuries and damages as they have all been personally diagnosed with cancers.

## COUNT III – TRESPASS

103.    Plaintiffs reassert the allegations of the foregoing paragraphs as if set forth fully herein.

104.    Defendants' conduct as set forth herein constitutes trespass which resulted in injuries and damages to the community surrounding the A-Plant, including injuries and damages to Plaintiffs and Class Members.

## COUNT IV – ULTRA-HAZARDOUS ACTIVITY/STRICT LIABILITY

105.    Plaintiffs reassert the allegations of the foregoing paragraphs as if set forth

fully herein.

106.  As stated before, radioactive isotopes are some of the most dangerous substances known to man. The Defendants' operations resulted in the extraction of these types of isotopes for various purposes.

107.  Various enriched products, consistent with an expulsion of the various materials kept at the A-Plant, have been found in the surrounding community. These materials are a risk to the health and safety of that community.

108.  Defendants' operations as set forth constitute a claim for an ultra-hazardous activity, which resulted in injuries and damages to the community, including the Plaintiffs and Class Members and thus strict liability attaches to the Defendants due to the hazards involved.

## COUNT V – INJUNCTIVE AND EQUITABLE RELIEF OF MEDICAL MONITORING AND CONTINUING TREATMENT

109.  Plaintiffs reassert the allegations of the foregoing paragraphs as if set forth fully herein.

110.  Plaintiffs and Class Members have been and continue to be exposed to radioactive contaminants, which are known to be carcinogenic substances, at a concentration higher than expected for the general populace.

111.  Plaintiffs and Class Members face a lifetime of latent, dread medical and emotional conditions, proven to be linked to exposure to radioactive particles.

112.  Defendants' tortious actions resulting in radioactive pollution have invaded the legal protections afforded Plaintiffs and Class Members by the laws of Ohio.

113.  Plaintiffs and Class Members will benefit from medical monitoring for the aforementioned medical and emotional conditions. Testing and continued monitoring will

bring to light the onset of these medical and emotional conditions so that treatment and intervention may begin at the earliest point possible.

114. Plaintiffs and Class Members will benefit from a medical monitoring program featuring an epidemiological component that collects and analyzes medical monitoring results so that other heretofore unrecognized latent, dread diseases that may be associated with exposure to radioactive particles may be identified so that treating professionals may better care for Class Members and so that medical professionals engaged in the research and development of new treatment will have access to a broader universe of data.

115. Further, Plaintiffs and Class Members will require on-going care for the conditions which they currently, or may in the future suffer from that are known results from exposure to toxic and radioactive materials.

116. The harms visited upon Plaintiffs and Class Members are irreparable.

117. Money damages will not suffice because it is impossible to predict with any certainty the costs of such monitoring and treatment for each individual class member. Nor is it possible to predict new treatment and intervention protocol that may be developed as data from the medical monitoring of Class Members is provided to the medical research community.

118. Furthermore, money damages will not suffice as an award of money damages for future monitoring and treatment would not result in comprehensive programs, whereby important information is shared among the medical community so that new treatments, protocols, intervention, and testing may be developed.

119. Plaintiffs, on behalf of all those similarly situated, seek a Court-administered

fund, replenished from time-to-time by the Defendants to achieve such injunctive and equitable relief as necessary for the continuing benefit of the class, including a Court-administered medical monitoring program.

120.    Given the immense wealth of the Defendants, such injunctive and equitable relief presents no undue burden or irreparable damage to the Defendants.

## COUNT VI – DECLARATORY JUDGMENT

121.    Plaintiffs reassert the allegations of the foregoing paragraphs as if set forth fully herein.

122.    Plaintiffs seek declaratory relief pursuant to Civ.R. 57, and R.C. 2721.

123.    The above allegations present ascertained or ascertainable facts of a present controversy between Plaintiffs and Class Members, and Defendants..

124.    Plaintiffs, on behalf of those similarly situated, seek declaratory judgment clarifying the rights and obligations of the parties to each other.

## COUNT VII - PUNITIVE DAMAGES

125.    Plaintiffs reassert the allegations of the foregoing paragraphs as if set forth fully herein.

126.    The conduct of the Defendants as set forth herein was malicious, oppressive, willful, wanton, reckless, and/or criminally indifferent to civil obligations affecting the rights of others, including Plaintiffs and Class Members.

127.    Plaintiffs and Class Members are thus entitled to recover punitive damages against Defendants.

128.    Defendants were malicious, oppressive, willful, wanton, reckless, and/or criminally indifferent to civil obligations affecting the rights of others, including Plaintiffs,

24

in their activities and in failing to warn Plaintiffs of dangers well known to Defendants, which acts exhibited a deliberate disregard for the rights and safety of Plaintiffs.

129.   Defendants realized the imminence of danger to Plaintiffs and other members of the public, but continued with deliberate disregard and complete indifference and lack of concern for the probable consequences of their acts.

130.   As a direct result of Defendants' deliberate disregard for the rights and safety of others, gross negligence, malicious, oppressive, willful, wanton, reckless, and/or criminally indifferent to civil obligations affecting the rights of others, including Plaintiffs, Plaintiffs suffered the injuries and dangers stated above.

131.   Defendants' acts as described herein exhibited deliberate disregard for the rights and safety of others and were malicious, oppressive, willful, wanton, reckless, and/or criminally indifferent to civil obligations affecting the rights of others, including Plaintiffs.  An award of punitive and exemplary damages is therefore necessary to punish Defendants, and each of them, and to deter any reoccurrence of this intolerable conduct. Consequently, Plaintiffs are entitled to an award of punitive damages. Plaintiffs' claim for punitive damages is derivative of the other causes of action named herein.

132.   The conduct of Defendants as set forth herein was malicious, oppressive, willful, wanton, reckless, and/or criminally indifferent to civil obligations affecting the rights of others, including Plaintiffs. Plaintiffs and the Class are thus entitled to recover punitive damages against Defendants in an amount sufficient to punish Defendants for their wrongful conduct and to deter Defendants and others from similar wrongful conduct in the future.

## DEMAND FOR JURY TRIAL

Plaintiffs and all other similarly situated hereby demand trial by jury on all issues in this Complaint that are so triable as a matter of right.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs and Putative Class Representatives James Matthews, Jennifer Brownfield Clark, Joanne Ross, and the Estate of A.R., and all those similarly situated request that the Court grant the following relief:

1) An Order certifying this action to proceed as a Class Action, authorizing Plaintiffs to represent the interest of the Class and appointing undersigned counsel to represent the Class;

2) Injunctive and Equitable Relief of a Medical Monitoring Program and Continuing Treatment Program;

3) Compensatory damages;

4) Statutory damages;

5) Restitution;

6) Punitive damages;

7) Attorneys' fees and costs;

8) Pre and Post Judgment Interest;

9) An Order establishing such administrative procedures as is reasonable to effectuate the relief granted to Plaintiffs and Class Members;

10) Declaratory relief clarifying the rights and obligations of the parties to each other; and

26

11)    All such other relief as the Court deems just and fair.

Date: 11/27/19                          Respectfully submitted by:

                                        Kelsey J. Reno (0097501)
                                        Aaron M. McHenry (0071308)
                                        Anna Villarreal (0077279)
                                        **Villarreal Law Firm, LLC.**
                                        2 W. Main Street
                                        Chillicothe, Ohio 45601
                                        (740) 772-4466
                                        legal@avlawohio.com

                                        /s/ Jack Harang
                                        Jack W. Harang, Esq. (pro hac vice pending)
                                        2433 Taffy Dr.
                                        Kenner, LA 70065
                                        Email: jwharang@gmail.com

27